**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS**

---

**UNITED STATES OF AMERICA**

**v.**                                                              **Case # 2:25r20314 SHL**

**ROBERT HARTHEIMER**

---

**SENTENCING MEMORANDUM ON BEHALF OF**
**ROBERT HERMAN HARTHEIMER**

---

Comes now Blake D. Ballin and Cathy Fleming (admitted *pro hac vice*), Attorneys for Robert Hartheimer, who file this Sentencing Memorandum in the instant matter.

PRELIMINARY STATEMENT

This Memorandum, along with the attached letters (Exhibit "A"), are respectfully submitted to assist the Court in fashioning an appropriate sentence for Robert Hartheimer.   As set forth more fully below and based on information contained in the Government's motion, we seek a sentence that is well below guidelines.

There is no question that June 4, 2026 will be one of the most difficult days in Robert Hartheimer's life.   It will also be one of the most painful days for his wife and his three sons, all of whom have remained steadfastly supportive of the husband and father who has been their anchor for many years.     As the Court will see from the letters submitted, the unfortunate and harmful events that led him to a guilty plea are very much at odds with the honorable man described by his wife, children, friends and business associates.   As the Court will read in his heartfelt letter, and as the Court saw at his Rule 11 proceeding, Mr. Hartheimer is profoundly remorseful for (and ashamed by) his participation in the events which cause him to stand before

1

the Court.    Since the day law enforcement showed up at his office on October 23, 2025, Mr. Hartheimer has done whatever he could to make amends. He has been cooperative with law enforcement. He agreed to a plea agreement early and without the need for the Government to engage in any discovery or litigation. He has been candid with everyone in the process.    He has been a model prisoner under difficult circumstances, in protective custody in the facility Consistent with his long history of bettering his community, he has attempted to and succeeded in making even his stay in protective custody beneficial for others in that situation including by starting an exercise group and by sharing his love of reading and his books with other inmates. He has not complained.    He has been in every respect a model prisoner including agreeing to and being interviewed for inspection audits (at the request of the head of the Shelby County Detention Center, Chief Baldwin).

The acts which put him before this Court are very much at odds with the long history, experiences and outstanding career of this 69 year old.    The Pre-Sentence Investigation Report sets forth a thumbnail and accurate sketch of the life that Mr. Hartheimer has led. He has enjoyed a 40 year marriage and has a lovely wife who is still very much in his corner. He and his wife, Nancy, have raised three wonderful boys, all of whom are productive and all of whom also continue to support their Dad.    As of May, he is a first time grandfather. His career is distinguished by any measure both in the private sector and government. Bob has been a pillar of his community in various endeavors, from career, to Temple member, to coach of his sons' sports teams.    He has walked the walk of making each community far better.

It is also fair to say that Bob has suffered significant losses as a result of his incarceration, personally.    He became a grandfather for the first time on April 30, 2026. One of his sons

2

married in May, 2026.      His third son is getting married in October, 2026. The ever-present, greatly involved father has missed out some of the most significant and joyous events a father can enjoy.      His mother is 99 years old.    Bob has been a devoted and active son; he is praying that he will see his mother in person again. We acknowledge that all people who are incarcerated face such losses, but as the Court will learn through the letters submitted, the loss of family involvement is brutal to both him and to his family.

Perhaps the most revealing materials presented to the Court affording a true picture of Bob are from the letters which are attached.    They describe a man for whom the writers have profound respect and admiration, as well as love. It is particularly remarkable that there are so many profound letters considering the crimes to which Bob has accepted responsibility. This genre of criminal activity often results in shunning by family and friends. That is not the case here.      His wife and three sons and other family are all very supportive, telling the Court that they have known this man for many years and know how decent and kind he is.    Friends and business colleagues, rather than looking away, have written to the Court to talk about the wonderful man they have known for many years. The people who know him best have painted a picture of the Bob they know, the Bob that is decent, reliable, generous and good.    He is 69 years old.    He has never before had any involvement with the law. We submit that he will *never* again face any Court nor *ever* again engage in any wrongdoing. We know that the Court will consider all the positives shared by these writers in considering the §3553 factors.

The very publicized arrest and prosecution of Bob have had dire and direct consequences. He was incarcerated immediately. He lost a career that he loved and at which he excelled.    He went from being a universally admired executive to a publicly ostracized sexual offender.    He

3

caused unfathomable pain to his wife of 40 years and to his three boys, as well as to his 99 year old mother. He is missing weddings and the birth of the first grandchild, and he has lost the ability to spend time with his 99 year old mother. He will be required to be a registered sex offender.

We are hopeful that when the Court considers all the circumstances – the facts of the case, the history and characteristics of the individual, the circumstances of his family and especially his 99 year old mother, his exemplary conduct while incarcerated, the goals of federal sentencing, his immediate acceptance of responsibility, as well as the amends he immediately tried to and did make – that the Court will impose a sentence which will be "sufficient, but not greater than necessary" to serve the statutory purposes of federal sentencing, *i.e.*, promoting respect for the law, providing just punishment, reflecting the seriousness of the offense, affording adequate deterrence, and protecting the public." 18 U.S.C. §3553(a)(2). We are respectfully imploring the Court to impose a sentence far below the Guidelines in this case to provide a light at the end of the tunnel for someone who has lived overwhelmingly a good life and contributed enormously to his community by anyone's measure and who will never again engage in any wrongdoing.

Sentencing Guidelines

The Pre-Sentence Investigation Report in this case sets forth the offenses to which Bob pled guilty.

On January 5, 2026, pursuant to a plea agreement with the Government, Robert Harthimer pled guilty to 2 count Information charging violations of: 1) 18 USC sections 2251 (a) and (e) and 2) 18 USC section 2422(b).

4

This Court is well aware of the historical case law governing sentencing. Clearly one of the most difficult responsibilities of a court is to fashion an appropriate sentence, one that is "sufficient but not greater than necessary."    Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which declared that the sentencing guidelines were "advisory" the federal courts once again have substantial discretion in sentencing pursuant to 18 U.S.C. §3553.

Following *Booker*, subsequent decisions of the United State Supreme Court have made it absolutely clear that the sentencing guidelines are merely "a starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). The guidelines are there to assist, but a sentencing judge "must make an individualized assessment based on the facts presented" and "may not presume that the guidelines range is reasonable."    *Gall*, 552 U.S. at 50.    The *Gall* decision makes it clear that that the sentencing inquiry is broad, discretionary and tailored to the individual defendant.

Title 18 U.S.C. §3553(a) mandates that "the court shall impose a sentence sufficient, but not greater than necessary," to achieve the stated goals of sentencing, and identifies the factors required to be considered. In fashioning an appropriate sentence the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing

disparities; and (10) the need to provide restitution to victims.

Sentencing is always difficult for a judge. It is a difficult task to weigh all the sentencing factors and come up with an appropriate and just sentence. The Court hears about the crimes committed in detail, but the Court's required assessment of that person as a whole is far more challenging. We appreciate that the Court will read the heartfelt letters from the people closest to Bob Hartheimer – as well as Bob's own letter – and consider the good characteristics of this man in determining the appropriate sentence.

(a) <u>The History and Characteristics of the Defendant</u>

The Pre-Sentence Investigation Report provides the facts that make up Bob Hartheimer . He is 69 years old. He has been married for 40 years. He has three sons, two of whom are married and the third is to be married in the fall.    He has a 99 year old mother and three sisters.

Bob has an excellent relationship with his children. He has always been a caring, present father.

It speaks volumes that despite the nature of the charges, compounded by the public embarrassment caused by the charges that Nancy and all three sons and their spouses are steadfastly and completely supportive of Bob.    It is no exaggeration to say that Nancy and the three boys—all of whom have done nothing wrong—will also be serving a sentence along with Bob.    Their letters show remarkable insight, empathy and awareness.

Bob's wife of 40 years, Nancy Golding, while acknowledging that the family is in a state of "extraordinary tumult, confusion and sadness", provides a poignant description of Bob as a "hard working, generous, competent, and loving husband, father, son, sibling, friend and colleague".    Her eloquent letter is heartbreaking.    After expressing how much she misses Bob,

6

she writes: "I am hopeful he will be released from prison with a substantial amount of quality time to spend time with his grandchildren, and of course, his sons, and with me.    I am certain that Bob has much more to contribute to society and to our family's life when he is no longer incarcerated." ("Exh. A- 2")

Adam Hartheimer describes the father he counted on and who is in his happiest childhood memories. He also expresses enormous empathy "for this person who I have loved and admired my entire life and whom I know must have been going through so much in silence", despite describing that the day of his dad's arrest as the "worst day of (his) life". ("Exh. A-5") Ben eloquently describes his "extremely loving, supportive, loyal and generous father" who was not one to express his love verbally, but rather through his actions. Ben notes that his family is committed to helping Bob with "whatever is necessary to rehabilitate himself". ("Exh. A-7") Jesse Hartheimer also describes how caring and involved Bob was in his upbringing,    pointing out that Bob has continued to be a leader even while incarcerated:    "Even under his current circumstances, my father has continued to find ways to contribute, helping to organize and bring other inmates together through group exercises and board games." ("Exh. A-8") Perhaps the most heartbreaking letter was written by Bob's 99 year old mother.    Her pride in her son's accomplishments jumps off the page. Marion Harcourt writes: "I will be 100 years old on November 20, 2026 and am healthy in mind and body. I want to be alive to see him free". ("Exh. A-3")

Bob's other family members also write of his devotion to family, as well as his compassion and support. His friends provide similar insights. William Meagher wrote that when his parents passed away, Bob "was there for me without hesitation, offering comfort and support

even though it was not a convenient time in his own life." ("Exh. A-23") Will Letchinger, his neighbor's son, wrote about    the many kindnesses Bob offered to him and his family, noting that "he is well known for all he does and how he can bring people together". ("Exh. A-22") Bill Minnock, a friend since childhood, describes examples of how Bob volunteered time and expertise for both Temple Sinai of Washington DC and as manager for more than 15 years of his sons' soccer teams. ("Exh. A-24")

We know that the Court will read all the letters carefully and have thus only quoted a tiny portion. Uniformly the letters from family and others describe a hardworking, kind and charitable man. Bob has not only been a very active and present family man, he has also been a positive contributor to the community. These letters give the Court a brief window into Bob's soul and his character. They represent 69 years of good and positive contributions.

There is no doubt that his life has changed dramatically. Bob's reputation has been tarnished in a very public way, which is no small punishment for a man who spent a lifetime earning an excellent reputation both in private and government sectors. Bob has not only lost his well deserved career and reputation, he has been publicly ostracized in the press. More importantly, he has lost what was most important to him: time for family. This year alone, Bob will be in jail while two of his sons are married and when his first grandchild arrives.    Bob understands and accepts the punishment to him; it is untenable to him that his family is being punished for his actions –fueled by alcohol—on October 22, 2025.    It is no exaggeration to say that he is mentally tortured by the pain he has caused and the pain that will continue to be caused by his absence.

Bob wrote a sincere letter dated May 21, 2026 ("Exh. A-1").    It is heartfelt and it

8

expresses his remorse and shame. He describes that he "greatly affected many people who love and trusted me and whom I care deeply about". He describes that he has already started psychiatric evaluation and treatment. Bob wrote that he understands that there are no excuses for breaking the law. He accepted the consequences of his actions promptly. He committed to the Court –and to his family--that he will never break the law again.

His actions corroborate his words. He has no prior convictions. He has worked diligently to try to make amends. He has continued to be a community leader in the community he now finds himself at the Shelby County Detention Center, including organizing an exercise group and sharing his love of books and sharing them with others.

In sum, Bob has been a wonderful husband and father and a valuable contributing member of his community. He admitted his culpability in committing the crimes to which he pled guilty, he accepted responsibility immediately, and he has taken real steps to make amends. He is precisely the kind of defendant that the Court can feel comfortable giving a significant break at sentencing.

The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

As noted, Bob does not seek to excuse or minimize his behavior. He owned up to his participation early and completely.    He pled guilty to two charges, both stemming from an undercover posing as a 15 year old on Grindr. Bob engaged with him and sent an explicit photo. He has told the Court that he is guilty.

We do not seek to minimize the criminal conduct. These are serious charges and we acknowledge them to be serious charges. We offer the following as explanation, and not as

9

excuse. This crime involved an undercover agent (and thus fortunately no victim) who was trolling on Grindr, a site known for people seeking voluntary sexual experiences and which require participants to be (or represent) that they are at least 18 years old. The activity involved text exchanges and the sending of photos. The acts were done when Bob had consumed significant alcohol, again, this is not an excuse, simply part of an explanation. The next day, Bob deleted the photos and the messages and made no attempt to follow up. Bob is grateful that it was an undercover and not a 15 year old, so that at least there is not a real victim. He admitted to his conduct very promptly and took steps to address the wrong.

As already discussed, Bob has been incarcerated, in protective custody (including in solitary confinement for a substantial initial period) at the Shelby County Detention Center. While there, his picture appeared on the television news for all the inmates to see, which led to other inmates seeking payments, resulting in protective custody. His arrest was broadcast and publicized nationally. His family had to deal with the fallout of the swift and public fall from grace. That fallout included a bulletin from the Temple where his wife was a teacher to all members of the Temple, informing of Bob's arrest and the charges. The effect of that bulletin was devastating to Nancy and the family. She retired from teaching as a result.

Bob in fact has enormous respect for the law. His otherwise law abiding 69 years shows that, as do the comments of many of his friends and colleagues who submitted letters to the Court.   Bob's letter to the Court, as well as his conduct throughout this entire ordeal, as well as his conduct at the Shelby County Detention Center, as well as his life's history, all show that he in fact appreciates the law and its officers.

We recognize the seriousness of the offense. We respectfully submit that Bob has and has

10

demonstrated profound respect for the law and that under the unique circumstances of this case particularly given the punishment he has endured from the moment of his arrest and its attendant ramifications, a sentence that is substantially below the guidelines is still a just sentence.

(b) Specific and General Deterrence

A lenient sentence would still satisfy the considerations of specific and general deterrence. *See* 18 U.S.C. §3553(a)(2)(B) and (C).   First, it should be clear that Bob Hartheimer will *never* commit any other crime.   He has been a model prisoner. The publicity and humiliation that Bob has endured is extraordinary. Bob understands what he has lost by his actions.   His involvement has weighed on him heavily; he is a textbook definition of remorse. Bob Hartheimer will never stand accused before any court again.

Even if his history before and after this scheme was not sufficient to show that Bob will not commit any other crime, Bob's age is another factor in considering specific deterrence.   He is 69.   As courts have noted, recidivism rates decline as age increases.   *See U.S. v. Cavera*, 550 F.3d 180, 216, 219 n.4 (2d Cir. 2008) (referencing the district court collecting cases and citing the 2004 United States Sentencing Commission study).

The goal of general deterrence is also met, including by a lenient sentence.   The fact of conviction alone can and does have a strong deterrent effect on educated older offenders.   The significant amount of publicity –as well as the shock waves and discussions in both his industry and in his personal circles—has certainly sent a message that engaging in this kind of conduct has dire consequences.   Unlike many other first time offender defendants, Bob was put into jail immediately and very publicly. All of these factors were publicized. There is no question that general deterrence is achieved.

11

The need to protect the public.

We respectfully submit that incapacitation through incarceration for a long time is not needed in this instance to protect the public.    First, it should be clear that Bob will never engage in such conduct again. He has lost everything he worked to attain and that he holds dear.    Even though his family is strongly in his corner, he knows he will spend the rest of his life trying to make up for the harm he has caused to the ones he loves most.

Bob has taken positive steps (in limited circumstances given his incarceration) to understand why he acted as he did so late in his life. He has consulted with Dr. Fred Berlin (via zoom from the facility). Dr. Berlin runs the National Institute for the Study, Prevention and Treatment of Sexual Trauma in Baltimore, Maryland. The purpose in meeting with Dr. Berlin was to understand how he ended up on Grindr in these circumstances. It is difficult to get evaluated and treated while incarcerated, but Bob has already started the process. As noted by Bob and some of his family members, and consistent with everything he has accomplished in his life, Bob will seek appropriate help to understand how this happened. Bob does intend to seek ongoing treatment with Dr. Berlin or his equivalent as soon as he is able to do so.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect,  "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far

12

better deterrent than its severity.").

The National Institute of Justice on June 5, 2016 issued "Five Things About Deterrence" which has several pertinent findings (https://nij.ojp.gov/topics/articles/fivethingsboutdeterrence):

1.  "the certainty of being caught is a vastly more powerful deterrent than punishment", noting that "research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment";

2.  "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime; …and

3.  "Increasing the severity of punishment does little to deter crime".

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See David Weisburd et al.*, Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); *see also Gabbay, supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).to protect the public from further crimes of the defendant.

Low Risk of Recidivism

Bob has promised the Court—and his family-- that he will never again be in a criminal court (Exh. A-1).   His life history shows Bob to be a man of his word.    In addition to his own evaluation, as well as his record of keeping out of trouble, there are other reasons to know why

Bob will never again commit any offense.

As noted, it is immeasurable what Bob has lost. There is no doubt that he is a very intelligent man. Bob knows that *any similar conduct will land him in jail for the remainder of his life.*    Finally, there is good statistical reason to believe he will not return to criminal conduct. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history.    For those like Bob, with no criminal history who are educated, have been employed, have been married, are drug free the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter Measuring Recidivism].    Finally, offenders like Bob with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. See Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004) [hereinafter First Offender].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account.    *See* First Offender at 1-2 (identifying goal of "refin[ing] a workable 'first-offender 'concept within the guideline criminal history structure"); Measuring Recidivism at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). While Bob is not eligible for the first offender points deduction due to the offenses to which he

14

pled guilty, the underlying reasoning still applies.

In imposing the least sufficient sentence to account for the need to protect the public from further crimes, this Court should consider the statistically low risk of recidivism presented by Bob's history and characteristics. *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties);   *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not  "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense .

The Need to Avoid Unwarranted Sentencing Disparities.

We respectfully seek a sentence substantially below guidelines.   As already noted, we do not seek at all to minimize Bob's activities. In considering this request, it is fair to look at sentences for similar crimes.

The United States Sentencing Commission issued a report in October 2021, Federal Sentencing of Child Pornography Production Offenses (the "Report").    United States Sentencing Commission, *Federal Sentencing of Child Pornography: Production Offenses* (Oct. 2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf.    The Report expands on an earlier 2021 Child Pornography Report and notes that sentences had increased over the years for crimes analyzed under 2G2.1 of the USSG. Among its findings was that in fiscal year 2019, production offenders received an average sentence of almost 23 years (275 months**), ranging from one year to life imprisonment**, and that over three quarters (78.0%) were convicted under a statute carrying at least a 15 year mandatory minimum penalty. *Id.*    **A majority of child pornography production offenders, however, received a variance below the applicable guideline range (57.2% of the 512 cases)** (*See Id.*, emphasis added). Other key findings included:

-- that a substantial minority of cases (41.0%) involved more than one minor victim, ranging from two to 440 victims.

--that the typical production offender maintains a position of trust over the victim and has physical access to the child during the production of child pornography (60.3%);

--that due to technological advances, more than one-third (35.4%) were internet strangers who met their victims through an online platform, more than double the proportion of offenders sentenced in 2010 who met their victims online (14.3%);

--That offenders who were in proximity to their victims—those who communicated with them in person –victimized younger children (83.5% were 12 or younger) as opposed to remote

CP productions offenders whose victims were teenagers (61.7%);

--the vast majority of 2019 offenders (80.9%) were sentenced for an offense that involved sexual contact of a minor; and finally

--Of the 512 child pornography production offenders, 40 percent incapacitated, coerced, or enticed a victim, or misrepresented their identity to a victim to facilitate their offense. *See Id.*, Key Findings;

Here, Bob is being sentenced for one incident, an adult FBI agent posing on Grindr as a 15 year old. Bob was an internet stranger. He did not abuse any position of trust. They did not meet, and undisputedly, Bob erased the texts the morning after the exchanges.

The fact that the Commission identified sentences from one year to life imprisonment demonstrates that courts (especially when not bound by mandatory minimums, as here) can in fact sentence totally within their discretion. Noting again that we in no way minimize the seriousness of the offense, we do note that the actions here are on the less culpable side of the scale. We submit that the Court can be comfortable sentencing to a substantially below guidelines sentence without concern that it will be a disparity from other offenders.

17

<u>THE COURT CAN AND SHOULD CONSIDER BUREAU OF PRISONS ("BOP")</u>

<u>ISSUES IN FASHIONING AN APPROPRIATE SENTENCE</u>

We have submitted herewith the certification of Jack Donson, dated May 26, 2026 ("Exhibit B").   Mr. Donson is the founder of My Federal Prison Consultant and has expertise in issues related to federal incarceration.   He describes some of the particular anomalies that Bob will have to face, discussing his lack of experience in the federal system, his classification as a sex offender (called CHOMO in prison parlance), and his age.    Mr. Donson notes that but for the offense, he would be placed almost certainly in a camp.    (We note that there is at least one publicized case (Ghislane Maxwell, convicted by a jury of sex trafficking) who received a waiver from the BOP and was placed in a camp.)   The Donson certification explains how the BOP will analyze his situation and how placements are made.   The certification also notes some of the particular issues a prisoner faces with these charges.   Mr. Donson suggested:

"In my professional opinion, it would be practical for the court to request the BOP apply an appropriate management variable for minimum security facility placement given his overall profile and vulnerability as a non-violent, first-time offender void of a prior prison experience.   The placement of a sex offender in a camp would not be a BOP precedent. Any recommendation made by the court is non-binding but will be seriously considered as the BOP has historically tracked compliance with judicial recommendations at over 70 %. The following language or something similar is suggested:

 *"The court recommends the designation to the Petersburg federal prison camp and does not object to the assignment of a <u>lesser security</u> management variable at the BOP's discretion given the defendant's age and lack of prior prison experiences, violence or criminal history.  If the BOP determines a secure facility is necessary, FCI Petersburg (low) is recommended. "*

We respectfully request that the Court make the recommendation as suggested by Mr. Donson.

18

CONCLUSION

We know that the Court will consider all of the good facts and opinions which have been provided to the Court on Bob Hartheimer's behalf, as well as considering the events underlying his conviction. We respectfully urge the Court to sentence well below the guidelines. Bob is 69 years old. A long sentence of incarceration is likely a death sentence. Bob is of course willing to do significant and meaningful community service to help others, as another step towards amends. He is of course also amenable to any special conditions of supervised release. We are imploring the Court to be as lenient as possible. Such a sentence will not only "temper justice with mercy" (Portia, The Merchant of Venice), but will also meet the goal to impose a "sentence sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2). The Court is not bound by mandatory minimums. We implore the Court to impose the most lenient sentence possible.

Dated: May 26, 2026

Respectfully Submitted,

/s/Blake D. Ballin, Esq.
BALLIN, BALLIN & FISHMAN, P.C.
200 Jefferson Avenue, Suite 1250
Memphis, TN   38103
(901) 525-6278

/s/Cathy Fleming, Esq.
FLEMING RUVOLDT, PLLC (pro hac vice)
779 Closter Dock Road
Closter, NJ 07624
 (201)615-4421

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served upon the Honorable Sheryl H. Lipman, Lauren Delery, Assistant United States Attorneys and all other interested parties via e-mail, via United States mail, first class postage prepaid, or via hand delivery, this the 26th day of May, 2026.

/s/Blake D. Ballin, Esq.